UNITED STATES of America,
Plaintiff/Appellee,

v.

Demareo Lamont DAVIS,
Defendant/Appellant.

UNITED STATES of America,
Plaintiff/Appellee,

v.

Dwayne Buford REED,
Defendant/Appellant.

Nos. 94–5037, 94–5053.

United States Court of Appeals,
Tenth Circuit.

Nov. 15, 1994.

Jackson M. Zanerhaft, Tulsa, OK, for defendant-appellant Mr. Davis.

Richard Couch, Broken Arrow, OK, for defendant-appellant Mr. Reed.

Thomas Scott Woodward, Asst. U.S. Atty. (Steven C. Lewis, U.S. Atty., with him on the brief), Tulsa, OK, for plaintiff-appellee.

Before SEYMOUR, Chief Judge, HOLLOWAY, and HENRY, Circuit Judges.

HENRY, Circuit Judge.

Defendants Demareo Davis and Dwayne Reed appeal their convictions resulting from an attempted armed robbery. The two men were convicted by a jury of: conspiracy to commit armed robbery of a credit union, in violation of 18 U.S.C. §§ 371, 2113(a) & (d); entering a federally insured credit union with the intent to commit armed robbery, and aiding and abetting in this offense, in violation of 18 U.S.C. §§ 2, 2113(a) & (d); and use of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1).[1] Although Mr. Davis and Mr. Reed file separate appeals, we decide both in this opinion.[2] We exercise jurisdiction under 28 U.S.C. § 1291 and affirm both convictions.

---

1. Mr. Reed was also convicted for aiding and abetting in this offense, in violation of 18 U.S.C. § 2.

2. Mr. Davis asserts three claims of reversible error: (1) admission of testimony by the government's deoxyribonucleic acid (DNA) expert; (2) admission of a sample of Mr. Davis's blood; and

(3) pronouncement of a longer sentence for Mr. Davis than for Mr. Reed. Mr. Reed asserts nine claims of reversible error: (1) admission of DNA evidence and expert testimony of statistical probability; (2) exclusion of an alibi witness; (3) admission of cumulative photographic evidence; (4) exclusion of a potential African–American ju-

## BACKGROUND

On May 13, 1993, two men entered the McDonnell–Douglas Federal Credit Union in Tulsa, Oklahoma, wearing hoods over their heads. One of the men was armed, and fired a handgun at the security guard. The bullet entered the guard's desk, puncturing the desk blotter, but leaving the guard uninjured. The assailants were not so fortunate. When the security guard returned the fire, he wounded one man in the chest, and the other man in the buttocks. The two men fled the scene of the robbery in a stolen automobile, throwing items of clothing out the window as they drove away. The Tulsa police later recovered the bloodstained clothing, the stolen car, and a bloody bone fragment from inside the car. Among the clothing the police recovered was one pair of sweat pants with a bullet hole in the seat.

Shortly after the exchange, the authorities were summoned to a local hospital, where Mr. Davis had sought treatment for a gunshot wound to the chest. Several months later, the police pursued an unrelated suspect to a home in East Tulsa. An occupant gave the police permission to enter the home, wherein the police recognized Mr. Reed as one of the suspects in the credit union robbery. What occurred next is disputed. At a suppression hearing, Mr. Reed testified that the police handcuffed him, took him into a bedroom, and then pulled down his pants to examine his buttocks for a scar from a bullet

wound. Two arresting police officers, on the other hand, testified that they asked Mr. Reed to remove his pants so they could examine his buttocks for a bullet wound and that Mr. Reed consented.

Mr. Reed then voluntarily accompanied the police to the police station. At the station, the police placed Mr. Reed under arrest and took him to a room where three police officers were present. One of the police officers made a telephone call in Mr. Reed's presence, and in his conversation made reference to the scar on Mr. Reed's buttocks. Mr. Reed overheard the conversation and interjected that he had injured himself by sitting on a nail.

Thereafter, the case proceeded to trial. During voir dire, the government exercised a peremptory challenge to strike a female African–American schoolteacher. The government stated that it had a practice of striking all schoolteachers from juries and also cited the prospective juror's inattentiveness during voir dire. Rec. vol. V, at 59.

■ At trial, the government introduced DNA evidence. All parties stipulated that Restriction Fragment Length Polymorphism (RFLP) DNA testing [3] is a generally accepted scientific technique.[4] Rec. vol. VII, at 351–54. The government then produced Special Agent Audrey Lynch to testify as an expert witness regarding DNA evidence.

---

ror by the government; (5) denial of Mr. Reed's motion to suppress evidence of a scar on his body; (6) denial of Mr. Reed's motion to suppress a statement made to police regarding a scar on his body; (7) refusal to grant a mistrial based upon the comments of Mr. Davis's attorney during closing arguments; (8) refusal to give Mr. Reed's proffered jury instruction regarding expert witnesses; and (9) refusal to grant Mr. Reed's motion for acquittal. After reviewing the parties' briefs, the reasoning of the trial court, and the record, we believe that only the first of Mr. Davis's three allegations of error and the first seven of Mr. Reed's nine allegations of error require discussion and find no merit in the other arguments.

3. For a thorough discussion of RFLP DNA testing, see *United States v. Bonds*, 12 F.3d 540, 550–51 (6th Cir.1993); *Gov't of the Virgin Islands v.*

*Penn*, 838 F.Supp. 1054, 1057–73 (D.Virgin Islands 1993).

4. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), decided prior to this case, has replaced the historical *Frye* "general acceptance" standard for the admission of scientific evidence with a different standard. No party cited *Daubert* at trial. Instead, the parties used language from *Frye*, stipulating to the "general acceptance" of RFLP DNA testing in the scientific community. However, because the new standard adopts the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony," *see Daubert*, —— U.S. at ——, 113 S.Ct. at 2794, and because the parties do not contest the propriety of that stipulation or raise arguments about *Daubert*'s first prong on appeal, we need not discuss the application of *Daubert*'s first prong to this case.

Agent Lynch testified about the protocol[5] for DNA testing, the actual physical procedures laboratory technicians use to conduct the tests, and the quality control techniques the Federal Bureau of Investigation (FBI) uses to insure accurate results. Specifically, she explained how the FBI analyzed blood samples recovered from blood on the bone chip and the clothing, and the test samples taken from Mr. Davis and Mr. Reed. She testified that the DNA sample recovered from the bone chip found in the abandoned car matched Mr. Davis's DNA, and that the blood on the recovered clothing matched Mr. Reed's DNA. Upon cross-examination, Agent Lynch stated that FBI technicians under her supervision conducted some of the actual laboratory tasks. Agent Lynch acknowledged that she was not present when the technicians conducted all the tests, but she testified that relying upon technicians was the usual procedure in her field.

Agent Lynch also testified about statistical probabilities of such "matches." She based her testimony on population genetics and stated that the frequency of such random matches among African–Americans to be 1 in 30,000 for Mr. Davis and 1 in 600,000 for Mr. Reed. The defendants objected to the admission of these statistics, arguing that their relevance was questionable because of the government's alleged failure to prove it had followed protocol. Rec. vol. VII, at 421–23. The district court overruled these objections, and allowed the jury to consider the testimony. Rec. vol. VII, at 432.

Also at trial, Mr. Reed objected to the admission of four photographs into evidence. Each photograph portrayed the damage to the security guard's desk from a different perspective. Mr. Reed argued that the trial court should have excluded these photographs as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence.

Mr. Reed also attempted to introduce the testimony of an alibi witness on the first day of trial. The court excluded this testimony because Mr. Reed failed to disclose the witness earlier in the proceedings when the government made a Demand of Notice of Alibi under Fed.R.Crim.P. 12.1.

In closing arguments to the jury, Mr. Davis's attorney argued that the evidence against Mr. Davis was not as strong as the evidence against Mr. Reed and that the jury should not convict Mr. Davis because of the evidence against Mr. Reed. Rec. vol. VIII, at 559. Mr. Reed objected and moved the district court to declare a mistrial. The court denied Mr. Reed's motion. The district court instructed the jury that it should consider the evidence against each defendant separately, and that counsels' arguments were not evidence for them to consider.

## DISCUSSION

### Admission of Testimony Regarding DNA Evidence

■ Both Mr. Davis and Mr. Reed contend that the trial court erred by admitting DNA evidence at trial. They argue that the court failed to adequately investigate whether the government followed protocol, and therefore that the government failed to establish the reliability of the DNA testing *in this case*. Mr. Reed also argues that the government's expert relied upon hearsay in forming her opinion and was not qualified to testify regarding DNA evidence. Mr. Reed further argues that the district court erred in permitting the expert to testify to statistical probabilities. We review a trial court's admission of evidence, including scientific evidence, under an abuse of discretion standard. *United States v. Muldrow*, 19 F.3d 1332, 1337 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994).

Although they did not cite the case at trial, Mr. Davis and Mr. Reed argue on appeal that the Supreme Court's recent opinion regarding scientific evidence in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S.

---

5. Many courts refer to the specific procedures lab technicians follow as "methodology." However, because we believe that methodology more properly applies to the type of DNA testing such as RFLP or allele specific probe analysis, we refer to these specific technical procedures as "protocol." For a discussion of protocol and the different methods of DNA testing, and a critique of the testing process, see William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va.L.Rev. 45 (1989).

——, ——, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993), requires a district court to find that the party offering DNA evidence followed protocol and that the district court erred by not investigating the testing process more fully. In *Daubert*, plaintiffs claimed that the drug Bendectin caused birth defects. The defendant drug manufacturer moved for summary judgment, arguing that no published study had found Bendectin to cause birth defects in human beings. The plaintiffs did not contest the drug company's characterization of the published research, but instead offered testimony of eight experts who concluded that, based upon animal research, laboratory tests, and reanalysis of published human studies, Bendectin could cause birth defects in children. The district court granted the drug company's motion for summary judgment. The district court reasoned that the plaintiffs' scientific evidence did not meet the *Frye* "general acceptance" standard because it was not "sufficiently established to have general acceptance in the field to which it belongs." *Daubert*, —— U.S. at ——, 113 S.Ct. at 2792 (quoting *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 727 F.Supp. 570, 572 (S.D.Cal.1989)); *see also Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The Ninth Circuit affirmed, basing its decision upon the district court's adoption of the *Frye* standard.

The Supreme Court reversed, however, holding that the adoption of Fed.R.Evid. 702 overruled the *Frye* general acceptance standard. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2794. The Court held that the standard for the admission of scientific evidence under the Federal Rules is not the *Frye* general acceptance standard, but rather whether the evidence will " 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Id.* at ——, 113 S.Ct. at 2795 (quoting Fed.R.Evid. 702). The Court rea-

soned that the "liberal thrust" of the Federal Rules of Evidence, *id.* at ——, 113 S.Ct. at 2794 requires a more "flexible" approach than *Frye*'s general acceptance threshold. *Id.* at ——————, 113 S.Ct. at 2797–98. The Court then announced a new analysis for future courts to undertake. This analysis requires a court to make a two-part determination: First, "whether the reasoning or methodology underlying the testimony is scientifically valid," *id.* at ——, 113 S.Ct. at 2796, and second, "whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at ——, 113 S.Ct. at 2796.

■ Because the defendants in this case do not raise arguments about *Daubert*'s first prong on appeal, the only issue presented for review is whether the district court properly applied *Daubert*'s second prong in admitting DNA evidence. Although *Daubert* clearly adopts the "liberal thrust" of the Federal Rules of Evidence, one circuit court has concluded that *Daubert* has *raised* the standard for applying science to particular cases. Mr. Davis cites *United States v. Martinez*, 3 F.3d 1191, 1197–98 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994) for the proposition that the district court should have more carefully inquired into the DNA testing process.[6] In *Martinez*, the Eighth Circuit interpreted *Daubert* to require a district court to inquire into the process by which a scientific conclusion was formed before admitting the evidence. The *Martinez* court held that *Daubert* requires a district court to make a specific finding that "the testimony was derived from the *application* of a reliable methodology or principle in the particular case" before it can admit scientific testimony. *Martinez*, 3 F.3d at 1198 (emphasis added). Although it is a matter of debate among the circuits,[7] the Eighth Cir-

---

**6.** It is unclear whether the *Martinez* court conducted its analysis of protocol under *Daubert*'s first or second prong. However, we believe that it is properly a second-prong inquiry. If the offering party does not follow protocol, the scientific evidence may not be relevant under *Daubert*'s second prong because improperly applied science cannot assist the trier of fact.

**7.** The Second Circuit Court of Appeals took a more flexible approach to the admission of DNA

profiling evidence in a case decided prior to *Daubert*. *United States v. Jakobetz*, 955 F.2d 786, 793–800 (2nd Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). In *Jakobetz*, the Second Circuit held that adherence to protocol should normally be an issue for the jury. *Id.; see also United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir.1994) (stating that in light of *Daubert*, "[t]he impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue not going to

cuit understands *Daubert* to require a district court to make a preliminary finding that the offering party adhered to protocol in the DNA context. *Martinez*, 3 F.3d at 1198. However, the district court in this case fulfilled the stringent *Martinez* standard and we need not address this apparent circuit split. We simply hold that the district court fulfilled *Daubert*'s requirements.

At trial, the government produced Agent Lynch to testify regarding the procedures the government used in preparing the profiles. Agent Lynch testified as to how the technicians prepared the samples and how the samples were tested. The district court also conducted a lengthy hearing on the DNA evidence before the jury and without objection from defense counsel. The government examined—and defense counsel cross-examined—Agent Lynch regarding the government's compliance with the protocol before she gave her opinion. Mr. Reed objected to Agent Lynch's testimony, and the district court overruled his objection. Rec. vol. VII, at 432. The district court thus had the opportunity to determine whether protocol was followed before Agent Lynch testified that the samples matched Mr. Reed and Mr. Davis and explained her statistical calculations. The district court thus conducted the functional equivalent of a preliminary hearing.

■ Mr. Reed also argues that the district court erred by admitting evidence of statistical probability. However, statistical probabilities are basic to DNA analysis and their use has been widely researched and discussed. Mr. Reed and Mr. Davis had ample opportunity to cross-examine experts and make arguments about probability to the jury. We therefore hold that the district court did not abuse its discretion by finding that the statistical evidence was more probative than prejudicial.

■ Mr. Reed next argues that Agent Lynch was not qualified to testify regarding population genetics. In this case, the district court reviewed Agent Lynch's qualifications

and allowed her to testify about genetics within the context of DNA evidence. Agent Lynch had thirteen years experience working for the FBI. She also held a Master's degree in cell biology from the University of Connecticut and had six months of specialized training in DNA profiling. A district court's acceptance of an expert's qualifications will be disturbed only for a clear abuse of discretion. *Beachum v. Tansy*, 903 F.2d 1321, 1331 (10th Cir.), *cert. denied*, 498 U.S. 904, 111 S.Ct. 269, 112 L.Ed.2d 225 (1990). Mr. Reed, on the other hand, has offered no reason why Agent Lynch is unqualified to testify regarding genetics. We therefore find no abuse of discretion.

■ Finally, Mr. Davis argues that Agent Lynch relied upon hearsay in her testimony because she utilized the notes of technicians in her analysis. However, Agent Lynch testified that it was accepted in her field to rely upon the notes of lab technicians and Mr. Davis offers no evidence to the contrary. It is also firmly established that an expert may testify from another person's notes. 1 *McCormick on Evidence* § 15, at 62–67 (4th ed. 1992); *see also* Fed.R.Evid. 703.

In conclusion, we believe that the defendants' objections to the DNA profiling evidence used in this case are not persuasive. The district court clearly complied with *Daubert*'s second prong by hearing lengthy testimony about protocol before the expert gave her opinion. Finally, the court determined that the evidence was not unfairly prejudicial under Fed.R.Evid. 403.

### Exclusion of Undisclosed Alibi Witness

■ Mr. Reed argues that the trial court abused its discretion by excluding an alibi witness. Mr. Reed attempted to elicit testimony from a previously undisclosed alibi witness on the first day of trial. The government objected, arguing that Mr. Reed failed to respond in writing when the government issued a Demand of Notice of Alibi under Fed.R.Crim.P. 12.1,[8] and that Mr. Reed's

the admissibility, but to the weight of the DNA profiling evidence").

**8.** Fed.R.Crim.P. 12.1(a) states:

Upon written demand of the attorney for the government stating the time, date, and place at which the alleged offense was committed, the

attorney responded orally to the government that there would be no alibi defense. Defense counsel argued that the witness should have been allowed to testify because he did not know the witness's name until one week before the trial and could not locate the witness until the morning of the trial. Consequently, counsel argued that he did not believe disclosure was required. Rec. vol. V, at 67–70. The district court exercised its discretion under Fed.R.Crim.P. 12.1(d), which allows the court to exclude such testimony when a party fails to comply with the requirements of Rule 12.1.

 This court reviews the exclusion of alibi evidence for an abuse of discretion. *See United States v. Fitts*, 576 F.2d 837, 839 (10th Cir.1978). In *Fitts*, inexperienced defense counsel was appointed near the deadline for response to the government's Rule 12.1 motion. The appointed counsel failed to respond, but then announced to the jury in an opening statement that the defendant intended to call an alibi witness. The trial court excluded the proposed testimony, ruling that the defendant could not show good cause for failing to respond to the government's motion. This court held that, although it would have been the better practice to allow the testimony under the circumstances, it was not an abuse of discretion to exclude the alibi witness. *Id.* at 839.[9]

In this case, the extenuating circumstances are not as compelling as they were in *Fitts*. Here, defense counsel was not appointed late and has not argued that the failure to inform the government of the alibi witness was based upon inexperience. Additionally, counsel knew the name of the alibi witness one week prior to trial, but failed to give the government notice of his intention to call the alibi witness. We understand the *Fitts* court's suggestion that the better practice is generally to hear an alibi witness. However, the district court maintains discretion in such matters, and it was not an abuse of discretion to exclude the testimony in this case.

### Photographic Evidence

Mr. Reed argues that the trial court abused its discretion by admitting four photographs that show the security guard's damaged desk. Mr. Reed argues that the photographs of the damaged desk should have been excluded under Fed.R.Evid. 403 because they were both cumulative and unfairly prejudicial.

Fed.R.Evid. 403 states that a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice … or needless presentation of cumulative evidence." "The decision to exclude (or admit) evidence under this rule is within the sound discretion of the trial court, and will not be reversed by this court absent a clear abuse of discretion." *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir.1985).

 "Evidence is cumulative if repetitive, and if 'the small increment of probability it adds may not warrant the time spent in introducing it.'" *Elwood v. Pina*, 815 F.2d 173, 178 (1st Cir.1987) (quoting 1 *Weinstein's Evidence* ¶ 401[07] at 401–47–48 (1985)). The photographs in this case show the desk from different perspectives. Two of the photographs, moreover, show relevant areas of the building and include the desk only in the background. It is not clear that these photographs only provided cumulative evidence, much less that their presentation was "needless." We cannot say that their admission was an abuse of discretion.

 Nor are the photographs at issue graphic, thereby raising issues of unfair prejudice under Rule 403. Mr. Reed contends that these photographs had minimal probative value, which was outweighed by a risk that "the jury would become outraged and

---

defendant shall serve within ten days, or at such different time as the court may direct, upon the attorney for the government a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state … the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.

Fed.R.Crim.P. 12.1(a).

9. *See also United States v. White*, 583 F.2d 899, 901–02 (6th Cir.1978) (holding that defendant is under an obligation to give the government notice of an alibi witness, even if defendant is unable to locate the witness).

strike out at the accused defendants." Brief of Appellant Reed at 14. After reviewing these photographs, the only thing we find outrageous is the assertion that photographs of a puncture in a desk blotter could incite, or even excite, a jury. The photographs merely portray a desk and the area surrounding the desk. Upon close inspection, a hole is visible in the desk blotter. These photographs are not nearly as graphic and prone to inciting a jury as other photographs this court has held are not unduly prejudicial. *See, e.g., United States v. Shoemaker,* 542 F.2d 561, 564 (10th Cir.), *cert. denied,* 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976) (holding that admission of graphic photographs of murder victim was not abuse of discretion under Rule 403). The admission of the photographs in this case was not unduly prejudicial, giving us no reason to find an abuse of discretion.

### Batson Challenge

■ Mr. Reed next argues that the government exercised a peremptory challenge to strike a prospective African–American juror because of her race. When Mr. Reed's attorney objected, the government explained that it had planned to strike all teachers and that the woman had not been attentive during voir dire.

In *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986), the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment forbids race-based discrimination in jury selection. However, "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion).

■ If we determine that the government's explanation for striking a potential juror was facially race neutral as a matter of law, we review the district court's decision under the clearly erroneous standard. *Id.* at 369, 111 S.Ct. at 1871. In this case, the government's explanation is race neutral and there is no evidence that the government excluded the juror because of her race.

In *United States v. Johnson,* 4 F.3d 904 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1082, 127 L.Ed.2d 398 (1994), the defendant argued that the prosecutor had violated *Batson* by using peremptory challenges to strike two African–American venirepersons. The prosecutor argued that the government had excluded one potential juror because it believed the person to be inattentive and the second potential juror because that person was a schoolteacher. This court held that a trial court should carefully scrutinize explanations of inattentiveness because of the potential for abuse. *Id.* at 913. However, we also held that a party may exclude all teachers from a jury. *Id.* at 913–14.

The record shows that the district court was sensitive to the *Batson* rule in this case. When defense counsel objected to the government's peremptory challenge, the judge noted that there were only two African–Americans on the thirty-one person panel and asked the government to explain its actions. The government stated that it believed the juror to be inattentive and that it planned to strike all teachers. The court accepted the explanation, and the government subsequently used all of its peremptory challenges to strike teachers. Rec. vol. V, at 59. In *Johnson,* inattentiveness and being a teacher were each sufficient justifications to allow the government to exclude two potential African–American jurors. In this case, inattentiveness and being a teacher are sufficient race-neutral justifications to allow a district court to determine that the government was not acting to exclude a juror because of her race.

■ Mr. Reed also argues, however, that by extending the *Batson* holding to women in *J.E.B. v. Alabama,* —— U.S. ——, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Supreme Court has implicitly extended the Equal Protection Clause to protect prospective jurors who are teachers. Mr. Reed asserts that women constitute a disproportionate share of teachers and therefore allowing the government to exclude teachers has a disparate impact on women. Although we question the wisdom of excluding any particular occupation from a jury panel, disparate impact is not a basis for a *Batson* challenge.

Instead, Mr. Reed must show intent to discriminate. *Id.* at ——, 114 S.Ct. at 1422. Because Mr. Reed has not attempted to show that the government intended to exclude either African–Americans or women, and because our recent decision in *Johnson* is directly on point, we find no error.

*Search and Seizure*

Mr. Reed argues that the district court erred by admitting the evidence of his scar. Mr. Reed argues that he did not consent to the search that revealed the scar on his buttocks.

■ In reviewing a district court's ruling on a motion to suppress, we accept the district court's finding of fact unless they are clearly erroneous and consider the evidence in the light most favorable to the government. *United States v. McIntyre*, 997 F.2d 687, 696 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 736, 126 L.Ed.2d 699 (1994).

■ Construing the evidence in favor of the government, there is sufficient evidence to find that Mr. Reed consented to the search. It is well-established that a suspect may consent to a search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *United States v. Nicholson*, 983 F.2d 983, 988 (10th Cir.1993). The government must show that there was no duress or coercion, that the consent was unequivocal and specific, and that consent was freely given under the totality of the circumstances. *Nicholson*, 983 F.2d at 988. The fact that officers do not specifically inform an individual that he or she has the right to refuse to consent to a search does not render that search coercive. *United States v. Zapata*, 997 F.2d 751, 757 n. 4 (10th Cir.1993).

In this case, two police officers testified that Mr. Reed was never handcuffed while he was in the house and that he consented to the search. Rec. vol. IV, at 23, 42–43. Although the presence of two police officers in a home might be intimidating to the point of negating the voluntariness of consent in some situations, we cannot say that the district court erred in finding the testimony of two police officers to be credible and Mr. Reed's consent to be voluntary.

*Miranda*

Mr. Reed also argues that he was improperly interrogated and therefore that the trial court should have suppressed his statement regarding the scar on his buttocks. This court reviews a district court's motion to suppress in the light most favorable to the government, and reviews a district court's findings of fact for clear error. *McIntyre*, 997 F.2d at 696.

■ In *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1629–31, 16 L.Ed.2d 694 (1966), the Supreme Court held that when a suspect is under custodial interrogation, the suspect must be warned of the Fifth Amendment privilege against self-incrimination. Only when the individual knowingly and intelligently waives these rights may a court admit a statement arising out of the interrogation. However, *Miranda* applies only if an individual is subject to "either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630.

■ In *Innis*, two police officers arrested a suspect they believed had killed a man with a shotgun. While the police officers drove the suspect to the police station, one officer stated to the other that he hoped a child would not be the first to find the missing shotgun. Concerned about that possibility, the suspect told the officers where they could find the weapon. The United States Supreme Court held that there had been no custodial interrogation because the officers had not invited a response from the suspect and would not have reasonably expected the suspect to respond. *Id.* 446 U.S. at 302, 100 S.Ct. at 1690.

In this case, the officers testified that Mr. Reed accompanied them voluntarily to the police station and that Mr. Reed was eavesdropping on a phone call when he made the comment attributing his scar to sitting on a nail. Rec. vol. VI, at 26–27, 45. According

to the testimony, one officer was speaking with the United States Attorney about securing an arrest warrant and mentioned the scars on Mr. Reed's buttocks. Mr. Reed then exclaimed that he had wounded himself by sitting on a nail.

In *Innis,* the officers and the arrested suspect were traveling together within the confines of a car. The officer in *Innis,* moreover, talked about what would happen if a small child found the shotgun—a potentially emotional topic that might be expected to elicit a response. Conversely, in this case Mr. Reed was not as close to the officers, and was eavesdropping on a telephone conversation where only one of the two parties to the conversation was even in the same room. The circumstances in this case were less likely to elicit a response than the circumstances in *Innis,* and there was thus no interrogation. We therefore affirm the trial court's denial of Mr. Reed's motion to suppress his statement about the scar.

### Statements During Closing Argument

Mr. Reed argues that Mr. Davis's attorney's comments during closing arguments were unfairly prejudicial and that the district court erred by not granting a mistrial. This court reviews a district court's decision regarding a motion for mistrial under an abuse of discretion. *United States v. Peveto,* 881 F.2d 844, 857 (10th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989).

This court has held that potentially prejudicial statements by a codefendant's counsel can be remedied through jury instructions. *United States v. Espinosa,* 771 F.2d 1382, 1399–1400 (10th Cir.), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985); *see also United States v. Mota,* 598 F.2d 995, 1000–01 (5th Cir.1979), *cert. denied,* 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980). In *Espinosa,* a codefendant acting pro se made statements incriminating his codefendants in his opening statement. The codefendants argued that they were denied their Sixth Amendment right to confront witnesses because they could not cross-examine the pro se defendant and moved for a mistrial. We held that it was not error for the district court to deny the codefendants' motions for a

mistrial. *Espinosa,* 771 F.2d at 1399–1400. We reasoned that the district court did not err because it instructed the jury that an opening statement is not evidence and because the statements were not "clearly inculpatory" to the other defendants. *Id.* at 1399.

The principle that a district court should use jury instructions to protect a defendant from the potentially prejudicial comments of a codefendant's attorney applies to this case. In addition, unlike the pro se defendant in *Espinosa,* Mr. Davis's attorney did not purport to testify against Mr. Reed. Mr. Davis's attorney, therefore, did not violate Mr. Reed's Sixth Amendment right to confront witnesses.

In this case, moreover, the statement was less antagonistic than the one in *Espinosa,* and the instructions to the jury were equally clear. Mr. Davis's attorney's statement was relatively mild. The statement did not incriminate Mr. Reed—it simply urged the jury to consider the evidence against each defendant separately during deliberations. Like *Espinosa,* the district court also clearly instructed the jury that it should consider charges against Mr. Reed and Mr. Davis separately and that statements by lawyers are not evidence. We therefore conclude that the district court did not err in denying Mr. Reed's motion for a mistrial.

For the reasons stated above, the convictions of the defendants are AFFIRMED.