**UNITED STATES of America, Plaintiff,**

v.

**William GALBRETH, Defendant.**

**Crim. No. 94–197 MV.**

United States District Court,
D. New Mexico.

Oct. 4, 1995.

David A. Freedman, Albuquerque, NM, for plaintiff.

Mary L. Higgins, Asst. U.S. Atty., Albuquerque, NM, for defendant.

## MEMORANDUM OPINION AND ORDER

VAZQUEZ, District Judge.

The subject of this Memorandum Opinion and Order is Defendant's Motion for Admission of Expert Opinion Evidence Regarding Polygraph Results, filed December 23, 1994. Plaintiff United States of America filed a Response, January 3, 1995, and Defendant filed a Reply, January 13, 1995. A *Daubert* hearing was held March 9–10, 1995, to determine the admissibility of Defendant's expert opinion evidence regarding polygraph results. At the conclusion of the hearing, the Court ruled from the bench and held that in *this* case the expert opinion evidence regarding polygraph results was admissible pursuant to Fed.R.Evid. 702 and 403. The purpose of this Memorandum Opinion and Order is to further explicate the Court's oral ruling.[1]

1. This case went to trial July 24–26, 1995. Upon the conclusion of the Government's case-in-chief, the Government dismissed the criminal charges against the Defendant. Thus, the Defendant's polygraph evidence was not in fact presented to the jury. Although the criminal charges have been dismissed, the Court nonetheless issues this Opinion elucidating the Court's oral ruling because it involves an issue of first impression.

## I. FACTUAL BACKGROUND

On April 8, 1994, the Grand Jury indicted Defendant William Galbreth, on three counts of willful tax evasion in violation of 26 U.S.C. § 7201, for intentionally filing returns which under reported his income. It is undisputed that Defendant failed to include on his income tax returns certain items of income which should have been reported. At trial, the sole issue is whether the willful mens rea existed, i.e., whether Defendant knew that his income tax returns omitted taxable income which should have been set forth on the forms.

At defense counsel's request, Dr. David Raskin, a professor of psychology at the University of Utah, administered a polygraph test to Defendant to determine his knowledge and intent regarding the items which should have been reported. The examination was conducted on August 10, 1994. Dr. Raskin concluded that Defendant was truthful in his statements that he did not realize his returns under reported his taxable income. At trial, Defendant intends to call Dr. Raskin as an expert witness to testify about the testing procedures, to explain how the test was evaluated and to explain his interpretation of the results. Dr. Raskin is expected to testify that the results are indicative of a truthful polygraph test outcome with regard to the relevant questions.[2] Dr. Raskin will not testify as to his personal opinion that Defendant was in fact telling the truth.

## II. *DAUBERT* STANDARD FOR ADMISSIBILITY OF SCIENTIFIC EVIDENCE

The Court must determine whether Dr. Raskin's testimony is admissible pursuant to the standard enunciated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113

2. The relevant questions are those questions on the polygraph test which specifically addressed Defendant's knowledge and intent regarding the items which he failed to report on his income tax returns.

S.Ct. 2786, 125 L.Ed.2d 469 (1993). Although the Tenth Circuit has repeatedly upheld the exclusion of polygraph evidence to prove the correctness of the results under the *Frye* "general acceptance" test, it has not addressed whether polygraph results are admissible pursuant to *Daubert*.[3] Thus, the issue before the Court is an issue of first impression.

In *Daubert,* the United States Supreme Court granted certiorari to consider the proper standard for the admission of expert scientific evidence in federal courts. The Court held that the *Frye* test for determining the admissibility of scientific evidence was superseded by the Federal Rules of Evidence, specifically by Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The *Frye* test required the proponent of the scientific evidence to establish as a foundation that the evidence was of a type generally accepted in the relevant scientific community. In rejecting the "austere," *id.* —— U.S. at ——, 113 S.Ct. at 2794, *Frye* test, the *Daubert* Court did not dispense entirely with the general acceptance inquiry. General acceptance continues to be a factor that trial courts should consider along with other factors in determining admissibility of purportedly scientific evidence. However, standing alone it is not dispositive.

Although the *Daubert* Court found that the "rigid," *Frye* test was incompatible with the "liberal thrust," of the Federal Rules of Evi-

dence and their general approach to relaxing the traditional barriers of "opinion," *id.* (*quoting Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, ——, 102 L.Ed.2d 445 (1988)), testimony, the Court nonetheless recognized that the rules place limits on the admissibility of purportedly scientific evidence. Trial judges maintain a vital "gatekeeping," *id.* —— U.S. at ——, 113 S.Ct. at 2798, or screening function. In performing this function, trial judges must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Id.* at ——, 113 S.Ct. at 2795.

Applying a plain meaning approach to Fed. R.Evid. 702, the Court held that in assessing the admissibility of scientific testimony, trial courts must determine that the testimony is based on *scientific knowledge* that will *assist the trier of fact* to understand or determine a fact in issue. First, the Court offered general guidance to trial courts in determining whether the proposed testimony constitutes "scientific knowledge." It explained that the adjective *scientific* implies a grounding in the methods and procedures of science and that the word *knowledge* connotes more than subjective belief or unsupported speculation. *Id.* The Court repudiated the notion that scientific knowledge is a static body of propositions that are "immutably true." *Id.* Rather, it recognized science as "a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement," and it explained that "in order to qualify as scientific knowledge," an inference or assertion must be derived by the scientific method. *Id.* According to the Court, that method is a validation technique consisting of the formulation of hypotheses and observation or ex-

---

**3.** It is noteworthy, however, that even under *Frye*, the Tenth Circuit did not foreclose the possibility that polygraph results might be admissible to prove truthfulness where the defendant lays the predicate foundation. Underlying this rationale is the Tenth Circuit's recognition that "without a doubt matters of factual proof must keep pace with developing scientific standards." *United States v. Wainwright,* 413 F.2d 796, 803 (10th Cir.1969). *See, e.g., id.* (holding that the trial court properly excluded the polygraph evidence where the defendant failed to lay the predicate foundation for admission, *even though in a*

*proper case it may be admissible* ) (emphasis added); *United States v. Hall*, 805 F.2d 1410 (10th Cir.1986) (admitting polygraph results only for the *limited* purpose of explaining the detective's failure to conduct a more complete investigation because it found that the reliability of polygraph tests was still in doubt, but not foreclosing the possibility that in a proper case such evidence may be admissible to show truthfulness); *United States v. Hunter*, 672 F.2d 815 (10th Cir.1982); *United States v. Russo*, 527 F.2d 1051 (10th Cir. 1975).

perimentation to test the hypotheses. Specifically, the Court explained that in order to constitute "scientific knowledge," the "proposed testimony must be supported by appropriate validation, i.e., good grounds based on what is known." *Id.* In this way, the Court clearly perceived science as an empirical endeavor. The Court further explained that the requirement that the expert's testimony relate to "scientific knowledge" establishes a standard of evidentiary reliability. *Id.* at ——, 113 S.Ct. at 2795.

Later in its Opinion, the Court offered more specific guidance to trial judges in assessing whether the proposed testimony constitutes "scientific knowledge." In making such a determination, trial judges must ask "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at ——, 113 S.Ct. at 2796. To assist trial judges in addressing this question, the Court enumerated a nonexclusive checklist of factors they should consider:

(i) Whether the theory or technique can be (and has been) tested. *Id.* The Court explained that "scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.* (quoting Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation,* 86 Nw.U.L.Rev. 643, 645 (1992)).

(ii) Whether the theory or technique has been subjected to peer review and publication. *Id.* at ——, 113 S.Ct. at 2797. Although the Court cautioned that publication is not a *sine qua non* of admissibility, the Court observed that submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. *Id.*

(iii) The known or potential rate of error of the technique or theory. *Id.*

(iv) The existence and maintenance of standards controlling the technique's operation. *Id.*

(v) Whether the technique is generally accepted within the relevant scientific community. *Id.* Although, the Court rejected "general acceptance" as the absolute prerequisite to admissibility of scientific evidence, the Court explained that "widespread acceptance can be an important factor in ruling particular evidence admissible," *id.* at ——, 113 S.Ct. at 2797, and "a known technique that has been able to attract only minimal support within the community may properly be viewed with skepticism." *Id.*

The Court emphasized that the inquiry envisioned by Rule 702 is a flexible one, and that its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie the proposed submission. *Id.* In making this inquiry, district courts must focus "on the principles and methodology, not on the conclusions that they generate." *Id.*

In addressing whether the proposed expert testimony will "assist the trier of fact" to determine a controverted issue, the trial judge must determine "whether the reasoning or methodology underlying the proposed testimony properly can be applied to the facts in issue." *Id.* at ——, 113 S.Ct. at 2796. This condition, as the Court recognized is essentially one of relevance. The expert's testimony must relate to an issue that is actually in dispute. In this way, the trial judge must determine whether the expert's testimony "fit[s]," *id.,* the facts of the case. The helpfulness standard in Rule 702 requires that the expert's testimony provide a "valid scientific connection to the pertinent inquiry." *Id.*

Finally, the Court alluded to other applicable rules of evidence that trial judges should consider. The Court specifically mentioned Rule 703, which permits expert opinions based on otherwise inadmissible hearsay to be admitted, provided the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," Rule 706, which permits the court at its discretion to procure the assistance of an expert of its own choosing, and Rule 403.

It is not entirely clear whether *Daubert* requires as a prerequisite to admissibility

that the proponent establish the validity of the specific application of a scientific technique. Thus, it is unclear after *Daubert* whether this Court must scrutinize the specific application of the polygraph technique, if the Court initially determines that the polygraph technique in the abstract is a valid scientific technique. The *Daubert* Court's ambiguity on this issue probably arises because the opinion spoke primarily of the validity of scientific principles in the abstract.

In the context of forensic laboratory testing, the circuits have apparently split on the issue. Unfortunately, the Tenth Circuit explicitly declined to address the split in *United States v. Davis*, 40 F.3d 1069 (10th Cir. 1994). Some Circuits emphasizing the *Daubert* Court's directive that "the focus must be solely on the principles and methodology, not on the conclusions that they generate," *id.* — U.S. at —, 113 S.Ct. at 2797, have held that such an issue goes to the weight of the evidence rather than to the admissibility of the evidence.[4] By contrast, in *United States v. Martinez*, 3 F.3d 1191 (1993), the Eighth Circuit held that "the reliability inquiry set forth in *Daubert* mandates that there be a preliminary showing that the expert properly performed a reliable methodology in arriving at his opinion." *Id.* at 1198. The court observed that the inquiry extends beyond simply the reliability of the principles or methodologies in the abstract and that in order to determine whether scientific testimony is reliable, the court must conclude that the testimony was derived from the application of a reliable methodology or principle in the particular case.[5] *Id.* In the context of DNA testing, the Court noted that the critical inquiry is "whether the expert erred in applying the protocol and if so whether such error so infected the procedure as to make the results unreliable." *Id.*

■ The issue at hand does not require the Court to determine whether, in the context of other forensic scientific techniques, a court must scrutinize the specific application of the scientific technique. Nor could the Court make such an assessment without evidence of the degree of error which may result from deviation from protocol. However, after reviewing the case law addressing this issue in the context of other forensic laboratory techniques and after careful consideration of the testimony presented at the hearing regarding the polygraph technique, the Court holds that in the context of polygraph evidence, such scrutiny is imperative to a faithful application of *Daubert*.

Such scrutiny appears to be mandated by *Daubert*'s directive that trial courts determine whether the purportedly scientific evidence is "reliable." In particular, the Court's emphasis on the *process* of arriving at reliable conclusions rather than the conclusion itself is instructive. As will be explained more fully below, the validity of polygraph results in a particular case is absolutely dependent on certain conditions such as a properly conducted examination by a competent examiner. Where the examination is not properly conducted by a competent examiner, the validity of the entire testing proce-

---

4. *See, e.g., United States v. Bonds*, 12 F.3d 540, 563 (6th Cir.1993) (in general criticisms touching on whether the lab[oratory] made mistakes in arriving at its results are for the jury); *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir.1994) (the impact of imperfectly conducted laboratory procedures is approached more properly as an issue going not to the admissibility, but to the weight of the DNA profiling evidence).

5. Professor Imwinkelried espouses a similar position. In the context of forensic laboratory testing he notes:

Once the process of validating a scientific hypothesis and putting the validated hypothesis to forensic use is understood, it becomes clear that use of correct protocol during the forensic test directly relates to the essential guarantee of trustworthiness of scientific evidence. While proof of the general validity of the general hypothesis and a showing of correct protocol are distinct factors affecting the trustworthiness of scientific evidence, the factors are closely related. An essential objective of proper forensic test procedure is replicating the conditions of the earlier experiments. No matter how impressive the validity rates achieved in the earlier research, the earlier experiments do not afford any assurance of the trustworthiness of the result of the instant forensic test unless the forensic scientist follows the correct procedure.

Edward J. Imwinkelried, *The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash.U.L.Q. 19, 30–31 (1991).

dure and hence the result of the procedure, is seriously called into question. Absent a showing that the examination was properly conducted by a competent examiner, the proponent simply cannot establish that the evidence is sufficiently trustworthy to be admissible in court.

Further militating in favor of this Court's approach is *Daubert's* more specific mandate that "proposed testimony be supported by appropriate validation." As will be discussed below, field and laboratory studies have validated the hypothesis underlying the modern polygraph technique. However, certain essential conditions, such as the administration of the exam by a competent examiner and utilization of standard polygraph techniques, existed at the time of the studies. Unless these conditions are also present during the specific test at issue, testimony concerning the test is not "supported by appropriate validation." Absent such essential conditions, there is absolutely no guarantee of trustworthiness in the results of the particular test. In this way, the testimony regarding the test results lacks the requisite validation which the *Daubert* Court considered so essential to admissibility.

This Court's holding is further supported by the *Daubert* Court's discussion of "the existence and maintenance of standards controlling the technique's operation" in conjunction with its discussion of the "potential rate of error of the underlying scientific hypothesis." Such conjunctive treatment of these factors appears to indicate the Court's concern that the specific test at issue be conducted in accordance with standard pro-

cedures and not merely that the underlying scientific hypothesis be validated.[6]

Thus, for the aforementioned reasons, this Court holds that in addition to establishing the scientific validity of the polygraph technique in the abstract, the proponent of the proposed testimony must also prove that the specific examination was conducted properly by a competent examiner.[7]

## III. DR. RASKIN'S BACKGROUND AND CREDENTIALS

At the hearing, the Court heard extensive testimony from Dr. Raskin regarding the polygraph technique.[8] Dr. Raskin holds a Bachelor's and Master's degree in psychology from the University of California, Los Angeles. In 1963 he received his Ph.D. degree from the same university in experimental psychology. He has been a professor of psychology at the University of Utah since 1968. As a professor, one of his duties is teaching. However, he devotes the greatest amount of his time to conducting scientific research and publishing scholarly works, primarily regarding the polygraph technique.

Dr. Raskin's particular specialty is in the field of psychophysiology. Psychophysiology is the scientific discipline that involves the study of the relationship between psychological processes and bodily reactions. Those trained in the field of psychophysiology measure the physiological reactions of individuals in controlled situations and from a knowledge of the situation and the stimulation that is presented can make inferences about psychological processes that the individual is experiencing. The polygraph is the primary in-

---

**6.** *See* Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn.L.Rev. 1345, 1358–59 (1994) (the Daubert Court's mention of the existence of professional standards in connection with its discussion of the rate of error of the underlying methodological examination provides some indication that the Court was concerned with how laboratory personnel carried out the scientific test in question, and not merely with ascertaining whether the test could provide results within a tolerable degree of error when the laboratory is working properly).

**7.** Although some of the *Daubert* Court's language on its face directs the trial judge's focus to the validity of the methodology and principles under-

lying the proposed submission as opposed to the correctness of the conclusions generated therefrom, this Court does not believe that such language was intended to apply in the context of the application of the polygraph technique. This is because the context in which the *Daubert* case arose required the Court to address only the validity of scientific principles in the *abstract*. If such language were to apply in the context of the polygraph technique, it would be completely at odds with *Daubert's* mandate that the proposed scientific testimony be validated, i.e., reliable.

**8.** The discussion that follows in Sections IV through VIII refers to Dr. Raskin's testimony unless otherwise noted.

strument used in the field of psychophysiology. Dr. Raskin has been using polygraphs in his research, teaching and training since he was a graduate student.

Dr. Raskin's credentials are impeccable. His 39–page curriculum vitae consists primarily of citations to his voluminous publications in professional journals, articles, papers presented at scientific meetings and invited lectures on the subjects of psychophysiology and the polygraph technique. Many of Dr. Raskin's publications describe laboratory and field studies that Dr. Raskin has personally conducted to determine the validity of the polygraph technique.

Dr. Raskin is a member of numerous professional and honorary organizations, including the Society for Psychophysiological Research and the American Psychology and Law Society. He has been elected a fellow of the American Psychological Association, a fellow and charter fellow of the American Psychological Society, a fellow of the American Association for Applied and Preventive Psychology and president of the Rocky Mountain Psychological Association.

As a graduate student, Dr. Raskin was initially extremely skeptical about the use of the polygraph instrument to detect truth or deception. Dr. Raskin's skepticism arose from his belief, shared currently by opponents of the polygraph technique, that it would be extremely difficult to determine truth or deception because there are no known reactions that are unique to lying, as opposed to anxiety, fear, stress or other kinds of emotional or cognitive events that cause similar physiological reactions. In fact, Dr. Raskin originally embarked upon his scientific research on the polygraph technique in order to discredit and get rid of a technique that he believed did not work and scientifically was not a very useful tool. However, to his surprise the first study that he conducted, which by his own admission was a "fairly primitive" study using "fairly primitive" equipment, indicated an accuracy rate significantly better than chance. From that point on Dr. Raskin became more involved in this kind of research and it began to dominate his scientific career.

## IV. THE POLYGRAPH INSTRUMENT

Dr. Raskin testified that the modern polygraph machine bears no resemblance to the primitive instrument scrutinized by the New York Court of Appeals in *Frye*. The machine scrutinized in *Frye* was a standard blood pressure type device comprised of a microphone and a cuff that measured the subject's blood pressure. The examiner asked the subject a series of questions during which time the examiner periodically took the subject's blood pressure. By contrast, the modern polygraph machine is a sophisticated instrument capable of continuously and simultaneously measuring and recording various autonomic responses.[9] It measures respiration at two points on the body; on the upper chest, the thoracic respiration, and on the abdomen, the abdominal respiration. Movements of the body associated with breathing are recorded such that the rate and depth of inspiration and expiration can be measured. The polygraph machine also measures skin conductance or galvanic skin response. Electrodes attached to the subject's fingertip or palm of the hand indicate changes in the sweat gland activity in those areas. In addition, the polygraph measures increases in blood pressure and changes in the heart rate. This measurement, known as the cardiovascular measurement, is obtained by placing a standard blood pressure cuff on the subject's upper arm. Finally, the polygraph may also measure, by means of a *plethysmograph*, blood supply changes in the skin which occur as blood vessels in the skin of the finger constrict due to stimulation.

Even opponents of the polygraph technique readily concede that a quality polygraph machine can accurately measure and record these responses.

**9.** Autonomic responses are responses that one is generally unable to control, such as blood pressure and the sweating of the palms. The autonomic nervous system controls how the body adjusts to changes in conditions. Because the autonomic nervous system is relatively impervious to voluntary control, it is very difficult for the subject of a polygraph exam to manipulate the outcome of a polygraph test.

## V. SCIENTIFIC THEORY UNDERLYING THE POLYGRAPH TECHNIQUE

According to Dr. Raskin, the underlying scientific theory upon which the modern polygraph technique is based is derived from the notion that if a person is threatened or concerned about a stimulus or question, such as a question addressing the matter under investigation, that this concern will express itself in terms of measurable physiological reactions which the subject is unable to inhibit and which can be recorded on a polygraph instrument. A skilled examiner can then review the charts and determine whether the subject is practicing deception or is being truthful in answering the questions concerning the matter under investigation.

### A. Control Question Technique

Dr. Raskin stated the most widely used and accepted polygraph technique is the control question technique. This particular technique was designed to overcome the weaknesses of the relevant-irrelevant technique.[10] The control question technique involves basically two types of questions; control or comparison questions and relevant questions that specifically concern the investigation at hand. The control questions are designed to arouse the concern of the innocent subject and it is expected that the subject will react more strongly to them than to the relevant questions. The control questions deal with acts that are similar to the issue of the investigation. However, they are more general, cover long periods of time in the life history of the subject, and are deliberately vague. During the pretest review of the control questions, the examiner carefully introduces the control questions to the subject so that in answering these questions on the test the subject is likely to be deceptive or uncertain as to the truthfulness of his answers. In this way, the innocent subject will react more strongly to the control questions than to the relevant questions. On the other hand, guilty subjects who answer the relevant questions deceptively will be more concerned about being detected in that deception than with the control questions. Thus, it is the comparative reactivity rather than the absolute reactivity to a particular question that forms the basis for determining truth or deception.

Dr. Raskin testified the pretest interview is absolutely critical to the accuracy of the polygraph results. First, as explained above, the examiner must introduce the control questions in such a way as to carefully manipulate the subject such that his answer is deceptive or likely to be deceptive. Second, if the examiner does not review the questions in advance, they will come as a surprise and may elicit the same kinds of reactions that would arise if the subject is being deceptive. Under such circumstances it is impossible to distinguish between the two potential causes. Third, if a question is asked for the first time on the test, the subject may have to analyze the meaning of the question in order to formulate an answer. This process of cognitive appraisal can cause substantial reactions which may be indistinguishable from a reaction caused by deception. Fourth, there may be terms in the question that are ambiguous which if not clarified during the pretest interview may cause a reaction indistinguishable

---

10. Dr. Raskin explained that the relevant-irrelevant technique is premised on the notion that attempts to deceive will produce elevated physiological reactions to crime-relevant questions and that those reactions will differ qualitatively or quantitatively from reactions associated with truthful answers to irrelevant or relevant questions. Thus, if a person shows stronger physiological reactions to a relevant question, such as, "did you shoot X?" than to the irrelevant question, such as, "is your first name Y?" the examiner assumes that deception to the question about shooting provoked involuntary autonomic processes that caused the observed difference in the reactions. On the other hand, if the reactions to the two types of questions are not observably different, the examiner assumes that the subject did not lie when he answered the relevant question. However, a variety of factors other than deception might cause a subject to react more strongly to questions about crimes of which they are accused than to innocuous questions. Those reactions are indistinguishable from reactions that occur as a result of deception. Primarily for this reason, the technique has major deficiencies and the results of this technique are subject to a great deal of error, particularly false positive error. Although the relevant-irrelevant technique may accurately detect all the guilty subjects, it erroneously labels almost all the innocent subjects as deceptive.

from a reaction caused by deception. It is extremely important that all of these potential problems by eliminated in advance of the test, otherwise the task of determining whether the subject's reactions are produced by deception or by some other factor is impossible.

The specific control question technique described above is known as the probable lie control question technique. The drawbacks of this technique are that it demands considerable manipulation of the subject, it can be very invasive and is cumbersome to use.

### B. Directed Lie Control Question Technique

Another type of control question technique and the technique employed in this case is the directed lie control question technique. This is a refined version of the probable lie technique. According to Dr. Raskin, there is no fundamental difference in the underlying scientific theories upon which the two tests are based. However, the directed lie test is more simplistic and straightforward to administer and is less intrusive than the probable lie technique.

The directed lie test includes questions to which the subject is instructed to lie. These directed lie questions are introduced after the administration of a number test during which the subject chooses a number and is then instructed to lie about the number chosen. The examiner tells the subject that the number test enables the examiner to determine the subject's characteristic response patterns when lying and when answering truthfully. The examiner then explains that the directed lie questions will ensure that the subject will be correctly classified as truthful or deceptive on the subsequent polygraph test. It is the expectation that the examiner sets that she can detect when the subject is practicing deception that causes the guilty person to be more concerned with the relevant questions than with the directed lie questions. As he answers the relevant questions, which are the questions that have put him in great jeopardy he will think to himself "oh, the examiner knows what my pattern looks like when I'm lying because she can see it on those questions to which she told me to

lie and she's going to see that this is the same pattern and I am going to be in big trouble." On the other hand, the innocent subject's concern is focused on the directed lie questions and the subject often thinks very hard to make sure he has something in mind when he answers those questions falsely so that it produces an enhanced reaction.

As with the probable lie control question technique, it is the differential reactivity of physiological responses to the control and relevant questions respectively that enables the examiner to determine truth or deception. Although the directed lie control question technique is a relatively new technique, it is currently used by the Drug Enforcement Agency, various military and intelligence agencies, the Internal Revenue Service and the Department of Energy. The polygraph institute devotes two weeks of instruction time to the use of the directed lie control question technique.

## VI. LABORATORY AND FIELD STUDIES

### A. Laboratory Studies

Laboratory and field studies have been conducted to test the scientific hypothesis underlying the probable lie control question technique. Dr. Raskin testified about specific studies that he has conducted. These studies were conducted scrupulously in accordance with the scientific method. Dr. Raskin estimated that hundreds of studies have been conducted and reported in the literature. Those of which are high quality studies number in the many dozens. On the whole, these high quality studies support the hypothesis underlying the control question technique. They indicate a slight difference in false positive as opposed to false negative errors. The error rate for the former is 10% and for the latter is 5%. Some of the methodologically weaker studies indicate a false positive error rate of 30–40%. Nonetheless, even the methodologically weaker studies indicate results in the predicted direction.

Dr. Raskin has been directly involved with approximately 12–15 laboratory studies, also known as "mock crime" studies. He testified about the methodology of these studies. Dr.

Raskin recruits people from the general community as participants. A participant is assigned either a guilty or an innocent condition. If the participant is assigned a guilty condition, he listens to a tape and hears a very realistic description of a theft that he is going to commit. Subsequently, he commits the theft on another floor in the building. After the theft, the participant returns and is taken for a polygraph exam. The participant is told that his job is to convince the polygraph examiner that he didn't commit the crime and if he does so he will receive a bonus of anywhere between $10–$500. The participant is also told that if he fails the test he will not get a bonus. The polygraph examiner who knows nothing about the subject's guilt or innocence uses standard polygraph techniques and standard interpretation techniques, such as the numerical scoring technique (discussed below), to determine whether the subject is being deceptive or truthful. All examiners are well-qualified and experienced.

The participants who are assigned an innocent condition receive general information about the theft and are instructed that they didn't commit it. They leave the floor and then return. They are told that their job is to convince the examiner that they didn't commit the theft. If they do this successfully they will receive a bonus. But if they fail, they will not. In this way, both types of participants, guilty and innocent, are motivated to pass the test just as in real life. These studies have produced accuracy rates in excess of 90%. In this way, the laboratory tests tend to confirm with a very high degree of accuracy the underlying hypothesis of the polygraph technique. Specifically, the accuracy rate for detecting guilty subjects is approximately 95% and for detecting innocent subjects is approximately 90%. That is, there are slightly more false-positive errors than false-negative errors. Thus, when a person passes the test, the examiner has higher confidence in the accuracy of the result than if the person fails the test.[11]

With respect to laboratory studies specifically involving the directed lie control question technique, at least one study has been conducted. Steven Horowitz, a doctoral student, conducted a study to investigate the role of comparison questions in a systematic way. This was a "mock crime" study that closely approximated the field situation. Horowitz compared the effectiveness of three techniques—the directed lie technique, the control question technique, and the relevant/irrelevant technique. The relevant/irrelevant test was administered to one group of subjects. Trivial directed lie questions were administered to another group of subjects. These were irrelevant or neutral questions to which the subjects were instructed to answer "no" instead of "yes." In this way, those questions were converted to a lie, to ascertain the effect of simply lying on such a comparison question. Another group were asked personal directed lie questions where the questions were relevant to the subjects, such as, "have you ever told a lie?" The fourth group were exposed to traditional probable lie questions. The subjects were then run through a "mock crime," as was described above, and then a polygraph test was administered on each of the them. Overall, the personal directed lie had the best utility. It had the highest ability to differentiate truthful and deceptive people accurately.

## B. Field Studies

Dr. Raskin also testified about field studies he conducted to determine the validity of the hypothesis underlying the probable lie control question technique. The most difficult aspect of conducting field studies is establishing criteria for determining ground truth, i.e., whether the person was, in fact, telling the truth or practicing deception. Dr. Raskin attempts to establish a reliable criteria for determining ground truth by finding a source of cases in which it is possible to determine retrospectively who in fact was telling the truth and who was lying. He inspects case files to find confessions where

11. It is noteworthy that the principle criticism of these studies is their underrepresentativeness of false-positive errors which opponents theorize are more likely to occur in the real life situation. Such criticisms are not relevant to this case because the error, if any, was a false-negative error.

there is no indication that the person confessed because of a plea bargain, or otherwise falsely confessed.

In 1988, Dr. Raskin conducted a study with the U.S. Secret Service where he gathered a sample of cases in which he used a combination of confessions and very compelling physical evidence that confirmed the confession. He then did one of three things: He either looked at the original examiner's result and determined how well she did in retrospect; had a polygraph examiner without knowledge of the case facts perform a blind independent interpretation of the charts, numerically score the charts and render a decision; or he analyzed the charts with the use of computers. The U.S. Secret Service study yielded an accuracy rate of approximately 94–95%.

Dr. Raskin also testified about another study conducted in Canada by Drs. Iacono and Patrick which utilized cases from the Royal Canadian Mounted Police. This study indicated that the original examiners were 100% accurate on the later verified guilty subjects and 90% accurate on the later verified innocent subjects. In addition, Dr. Charles Hontz conducted a recent study which yielded similar results.[12] Again, as with the laboratory studies, the field studies consistently show that when there are errors, the errors are more likely to be errors where an innocent person fails the test rather than a guilty person passing or beating the test.

Other types of field studies have been conducted to determine the validity of the probable lie control question technique. However, because they have less scientific validity and competent experts in the field place less weight on them, the Court has not considered these studies in determining the validity of the polygraph technique. They include studies which utilize panels of experts who review all evidence in the case to determine whether it is consistent with guilt or innocence and studies which utilize judicial outcomes as the criterion for determining ground truth. Although less scientifically valid, these studies have nonetheless yielded results fairly consistent with the confession studies.

Specifically, with respect to the directed lie control question technique, at least one field study has been conducted. Dr. Raskin and Dr. Hontz published a field study in 1988 concerning the validity of the directed lie technique. The purpose of the study was to evaluate the effectiveness of the directed lie control question technique in comparison to the standard probable lie control question technique. The subjects consisted of an exhaustive sample of available confirmed field cases that employed the directed lie control question technique on criminal suspects. The twenty-five criminal suspects had been referred to Dr. Raskin and Dr. Hontz by both prosecution and defense counsel between January 1983 and January 1987, for polygraph examinations. The polygraph exams contained both directed lie control questions and probable lie control questions. Confirmation of guilt or innocence was determined without reference to the polygraph outcomes and was based either on confession or on incontrovertible physical evidence developed after the polygraph examination was administered. They accumulated data over a period of several years in which they were able to independently verify guilt or innocence, i.e., whether or not the subjects were lying or telling the truth on the polygraph tests. Thus, the guilt or innocence of the subjects was determined by the use of an objective criterion developed independently of the polygraph outcomes.

Dr. Raskin and Dr. Hontz analyzed each other's charts blindly and scored them with and without the directed lie question. They

---

12. Although the field studies described above have yielded high accuracy rates, in 1983 the Office of Technology and Assessment of the U.S. Congress concluded from a review of 10 field studies on the validity of the control question technique that "the research suggests that when used in criminal investigations, the polygraph test detects deception better than chance but with significant errors." First, it is noteworthy that the studies reviewed took place prior to 1983. Second, the validity of this conclusion has been challenged by Dr. Raskin because he questions the training and skill of the polygraph examiners who conducted the tests and the adequacy of the test methods and diagnostic procedures employed. By contrast, the studies that Dr. Raskin has conducted have involved properly trained and qualified examiners employing standard field methods for conducting the tests and interpreting results.

found that when the directed lie question was included, it made a noticeable difference in reducing the false positive errors. That is, more innocent subjects now passed the test and the average score of the innocent subjects increased significantly. With respect to guilty subjects, there was basically no difference in terms of the average score. This field study provides support for the validity of the directed lie control question technique on criminal subjects where the exam is properly conducted by a qualified examiner.

According to Dr. Raskin, the results from the laboratory and field studies are consistent with the proposition that the directed lie control question technique represents an improvement over the traditional probable lie control question technique. It is more standardized, easier to administer, requires less manipulation, creates fewer problems for the subjects, and most importantly it reduces the problem of false-positive errors inherent in the probable lie control question technique.

## VII. SCORING TECHNIQUES

Dr. Raskin testified that the earliest method for evaluating polygraph results was called the "global" method. This method continues to be used by some examiners. It is comprised of the examiner's overall impression of the charts plus other factors, including the examiner's "clinical impressions" of the subject during the pretest interview and examination. Thus, the examiner considers both the subject's demeanor as well as the physiological reactions recorded on the machine. The obvious drawback of this method is its subjectivity.

By contrast, the numerical method of evaluating polygraph results, introduced in 1960, helps to ensure a rigorous, semi-objective evaluation of the physiological information contained in the charts, thereby safeguarding against examiner bias. This method involves a systematic procedure of applying a set of scoring rules, writing down numbers and adding them up in order to reach a conclusion. The examiner inspects the relative size

of reactions to the relevant and control questions for each of the physiological measurements and assigns a number to that comparison reflecting the amount of observed difference. If there is no noticeable difference, the examiner assigns a zero. If there is a noticeable difference, the examiner assigns a one, two or three depending on the degree of the difference. The examiner assigns a positive number if the reaction to the comparison question is greater than the reaction to the relevant question and a negative number if the reaction to the relevant question is greater. This method is the most widely used method and has been the subject of the most research.

Another method of quantitatively evaluating test results is by computer. The specific computer scoring method used in this case was developed by Dr. Raskin and has been subjected to scientific investigation. It works by an analytic solution using a standard computer program. The examiner simply runs the program and the computer makes tens of thousands of calculations within five to ten seconds. This scoring method is completely objective.[13]

## VIII. CHALLENGES TO THE POLYGRAPH TECHNIQUE

Dr. Raskin testified that several challenges have been raised to the polygraph technique. Some of these challenges are valid but inapplicable in this case. Other challenges, when closely scrutinized are without merit and, in fact, have been empirically discredited.

### A. Examiner Incompetence and Lack of Integrity

The competence of the examiner is crucial in arriving at reliable polygraph results. This is so because it is the examiner who determines the suitability of the subject for testing, formulates proper test questions, establishes the necessary rapport with the subject, stimulates the subject to react, and interprets the charts.

**13.** The particular computerized scoring method utilized in this case has been used by various organizations and government agencies, including the U.S. Secret Service, the Department of

Defense, the CIA, law enforcement agencies outside the federal government in different parts of the country, the Canadian Police College, and other foreign governments.

Dr. Raskin has written that one of the major problems with polygraph evidence is the "sorry state of training for polygraph examiners." The American Psychological Association has also commented on the need for improved training of polygraph examiners noting that those administering polygraph tests often have limited training and expertise in psychology and in the interpretation of psychophysiological measures. This concern with respect to the general competence of polygraph examiners is not relevant in this particular case. Here, the exam was conducted by Dr. Raskin himself, perhaps the world's leading expert in the field of autonomic psychophysiology and on the polygraph technique.

Another challenge raised with respect to examiners, is the ability of a polygraph examiner to manipulate the subject and the examination in such a way as to produce a desired result. Although this is certainly a valid concern, it is not relevant in this case. Dr. Raskin complied with the New Mexico Rule of Evidence 11–707, which permits admission of polygraph results provided that certain conditions are met. One of those conditions is that the exam be either audio or visually tape recorded. Because Dr. Raskin complied with this condition and defense counsel provided a tape to the Government, if any attempts to manipulate the subject were made, they would have been revealed on the tape and the Government would have brought them to the Court's attention. Moreover, it cannot seriously be argued that a person of Dr. Raskin's esteem and integrity would engage in such unethical practices.

### B. Examiner Shopping

Another challenge raised is the problem of "examiner shopping." If enough tests are conducted, it is argued that a psychophysiological habituation to the relevant test questions or perhaps even chance may result in a guilty subject eventually passing the test.[14] Thus, if only the final test, the one passed is presented to the jury the result would be misleading. Although this may be a valid

concern, it is inapplicable here. There is absolutely no indication that this kind of examiner shopping occurred in this case. In fact, Dr. Raskin testified that to his knowledge this was the only polygraph test which was conducted on the Defendant.

### C. Certain Personality Types can Defeat the Test

Dr. Raskin stated that some opponents of the polygraph technique have suggested that people with certain personality types, such as psychopaths can beat the polygraph test. However, this hypothesis has been invalidated. Dr. Raskin has personally conducted several studies to determine whether psychopaths can beat the polygraph. His studies have indicated very clearly that psychopaths cannot beat a properly conducted test. Dr. Iacono has also conducted a study with some variations and found a similar pattern although the study did not yield such high accuracy rates and yielded considerably more false-positive errors. Dr. Iacono concluded that the polygraph technique is at least as effective with psychopaths as with other individuals.

### D. Use of Drugs as a Countermeasure

Another frequently raised challenge to the polygraph technique, according to Dr. Raskin, is that drugs may be used to defeat the test. It has never been demonstrated that drugs can be an effective countermeasure against the control question technique. Dr. Raskin explained that this is so because the control question technique requires differential reactivity between the control and the relevant questions and there is simply no drug that can selectively reduce the reaction to relevant questions while leaving the control questions unaffected. At worst, in theory the effect of the drug may make the result of the test inconclusive. However, according to Dr. Raskin the studies indicate that the use of drugs does not interfere with the ability of the control question technique to accurately detect deception.

14. New Mexico Rule of Evidence 11–707 has addressed this concern by requiring as a precondition to the admissibility of polygraph evidence that all polygraph examinations conducted on the subject be disclosed.

## E. Friendly Polygrapher Hypothesis

A theory that has been posited against the admission of polygraph results by defendants is the "friendly polygrapher" theory. This theory, warmly embraced by many courts, was first suggested by Dr. Martin Orne, a psychiatrist-psychologist in Pennsylvania. Dr. Orne hypothesized that if a person takes a polygraph test on a confidential basis where the formal understanding is that if he passes the test it may be helpful to him, but if he fails the test it falls under attorney-client privilege and cannot be disclosed, that such person unconcerned with failing the test would be able to beat the test. According to Dr. Raskin, this hypothesis has never been validated and, in fact, the only research bearing on it does not support it. He testified that all the accumulated experience of conducting confidential tests for defense attorneys shows that people who are guilty fail the test. Furthermore, he explained that on a theoretical basis, Dr. Orne's hypothesis does not make sense because in order for it to work, the subject would still have to react to the control questions. If the subject is not worried or concerned about the outcome of the test, then the subject would not react anymore to the control questions than to the relevant questions.

In practical terms, the theory does not make sense either, because there is much at stake for a person in that situation even if he believes that the results cannot be used against him. It is clear that such motivation is extremely compelling when it is considered that in the laboratory setting it is known that the prospect of a $5 bonus produces deceptive accuracy on guilty people on the order of 95 percent. Such subjects are very concerned about failing the test. First and foremost, their liberty is at stake. If they pass the test they will be exonerated. Second, the test itself may cost a substantial amount of money. Third, there is always the concern of what their attorney will think about them if the polygraph results indicate that they are lying and, therefore, have been lying to their attorney. In sum, there is plenty of incentive to pass the test; much more than the potential of earning $5, $10 or $500 dollars in a mock crime study.

## F. Physical Countermeasures

Dr. Raskin testified that another challenge raised to the polygraph technique is that a person can beat the test by engaging in physical countermeasures. He stated that research indicates that if a person is given specific training by an expert on how to employ certain kinds of subtle, unobservable maneuvers, if the test process is explained to them, and if they practice the techniques while being observed by an expert, a substantial proportion of them, possibly up to 50%, can produce an erroneous result on the polygraph test in a mock crime situation. Such maneuvers include unobtrusively biting the tongue lightly to produce reactions on control questions, tensing muscles in the legs to produce reactions on the control questions, or engaging in mental arithmetic by subtracting backwards by sevens implicitly on control questions. Under such circumstances, Dr. Raskin explained experts cannot even detect that the subject has been engaging in countermeasures. However, he clarified that merely providing a subject with extensive information about countermeasures does not enable a subject to effectively use them. Without specialized hands-on training from a sophisticated expert, attempts to defeat the test by engaging in countermeasures are invariably unsuccessful.

The Court recognizes that countermeasures can be used to defeat polygraph tests without detection. However, because an individual must receive highly specialized hands-on training in order to successfully engage in countermeasures, the possibility that a subject will succeed in such measures is very slight. This possibility is not sufficient to render the entire polygraph technique invalid. Nor does it invalidate the application of a specific test. Rather, it is a factor that can be considered as going to the weight of the evidence rather than to its admissibility.

## IX. APPLICATION OF *DAUBERT* TO THIS CASE

■ The first inquiry under *Daubert* requires the Court to determine whether the testimony regarding polygraph results is

based on scientific knowledge. Essentially, the Court must determine whether the reasoning underlying the testimony is scientifically valid. In addressing this issue, the Court must consider several nonexclusive factors delineated below.

### (1) Whether The Directed Lie Control Question Technique Can Be And Has Been Tested.

The traditional "probable lie control question technique" and the refined version of that technique, "the directed lie technique" can be and have been tested. Unlike an endeavor such as astrology, the scientific validity of which can never be empirically verified, it is possible to test these polygraph techniques. There have been numerous field and laboratory studies conducted to determine the validity of the traditional probable lie control question technique and there have been at least two studies conducted to determine the validity of the directed lie control question technique. One field study and one laboratory study. Thus, not only is it possible to test whether these polygraph techniques can accurately detect truth or deception but, in fact, the techniques have actually been tested.

### (2) Whether The Directed Lie Control Question Technique Has Been Subjected To Peer Review And Publication.

There have been hundreds of articles published on the traditional probable lie control question technique, from which the directed lie control question technique has evolved. Many of these articles have been published in peer-reviewed journals and otherwise subjected to the scrutiny of the scientific community. There have been considerably fewer publications addressing the directed lie control question technique, due to the fact that this technique has emerged relatively recently. However, the technique has been published in at least two peer-reviewed journals and otherwise subjected to the scrutiny of the scientific community. An article written by Dr. Hontz describing a laboratory and field study involving the technique, was published in Current Directions in Psychological Science. This journal is published by the premier psychological society in the world, the American Psychological Society, which has in excess of 16,000 members each of whom have very strong scientific credentials. The article was invited by the editor, and it received thorough reviews. In fact, some revisions were made in response to the reviews. Another article addressing the directed lie control question technique and written by Dr. Raskin and Dr. Hontz was published in the Journal of Police Science and Administration. Both Dr. Raskin and the Government's expert witness, Dr. Gordon Barland, characterized this journal as a "peer reviewed" publication.[15] Finally, a laboratory study concerning the directed lie control question technique conducted by Steven Horowitz has been subjected to peer review. This study was presented at the Society for Psychophysiological Research meetings after acceptance to the program following rigorous peer review. In addition, an abstract of the paper containing all the findings of the study was published in the Journal of Psychophysiology, a peer-reviewed journal.

The fact of publication in and of itself is significant, because it serves to expose the technique to the scrutiny of the scientific community. The *Daubert* Court considered such exposure to be a "component of good science." However, the fact that articles concerning the directed lie control question technique have been published in *peer-reviewed* journals is particularly significant given the substantial guarantee of reliability that attaches to such closely scrutinized articles.[16]

### (3) What is the Known or Potential Rate of Error?

Sufficient testimony was presented through Dr. Raskin to satisfy the Court that

**15.** Dr. Barland is the chief of external research at the Department of Defense Polygraph Institute. He studied under Dr. Raskin at the University of Utah where he received a Master's and Ph.D. degree in Experimental Psychology (Human Psychophysiology).

**16.** *See* Howard A. Denemark, *The Search For "Scientific Knowledge" in Federal Courts in The Post–Frye Era: Refuting the Assertion That "Law Seeks Justice While Science Seeks Truth."* 8:2 High Technology Law Journal 235, 240 (1993).

the known rate of error, where the exams are properly conducted, where the numerical scoring system is employed, and where the examiner is highly qualified, is approximately 10% with innocent subjects, i.e., false-positive errors, and 5% with guilty subjects, i.e., false-negative errors. Consistently, the studies have indicated that the percentage of false-positive errors is greater than false-negative errors. Thus, in this particular case where the error, if any, was a false-negative error, the Court's confidence in the reliability of the result of this test is greater than it would be had the defendant been diagnosed as deceptive/guilty. Although, the directed lie technique is relatively new, preliminary studies have indicated that it has at least as high an accuracy rate as the probable lie control question technique and in fact appears to reduce the number of false-positive errors.

### (4) The Existence and Maintenance of Standards Controlling the Technique's Operation.

Standards exist which control the polygraph technique's operation. More than twenty states, including New Mexico, have licensing regulations. Such regulations are intended to ensure that polygraph examiners will be sufficiently qualified to competently administer polygraph tests. Dr. Raskin, the examiner in this case, is licensed in at least Utah and New Mexico. These particular states have very extensive licensing requirements for obtaining and maintaining a license.

In the federal sector, in order to practice as a polygraph examiner for an agency, an individual must attend a polygraph school, usually the Department of Defense Polygraph Institute, and must receive a certificate before he can administer polygraph tests. In addition, most of the agencies have quality control programs where the examiners' work is periodically reviewed.

New Mexico Rule of Evidence 11–707, establishes standards for the admission of polygraph evidence. It provides that polygraph evidence is admissible only where the following conditions are met: the examiner must have had at least 5 years experience in conducting polygraph tests and 20 hours of continuing education within the past year; the polygraph examination must be tape recorded in its entirety; the polygraph charts must be scored quantitatively in a manner generally accepted as reliable by polygraph experts; all polygraph materials must be provided to the opposing party at least 10 days before trial; and all polygraph examinations conducted on the subject must be disclosed. In this case, Dr. Raskin and defense counsel complied with all conditions of Rule 11–707.

### (5) General Acceptance in the Relevant Scientific Community.

Although the polygraph test has been plagued with controversy both in the legal and scientific communities since its infamous appearance in *Frye*, it now appears that there is general acceptance of the control question polygraph technique when it is administered properly by a qualified examiner. Both Defendant's and the Government's expert witnesses testified that amongst more than a majority of experts in the field of autonomic psychophysiologists the polygraph has attained acceptance.[17] In the broader field of psychophysiology, the technique also appears to have attained a significant degree of acceptance.

Two surveys have been conducted amongst a sample of psychophysiologists. One in 1982, the Gallup survey, and one in 1992, the Amato Survey. The surveys indicated that of those surveyed, 62% and 60% respectively, of psychophysiologists believed that the control question polygraph technique was a useful tool when considered with other evidence for assessing truth or deception. Significantly, the 1992 Amato survey indicates that acceptance of the technique amongst those who consider themselves well-informed of the literature is considerably higher. Eighty percent of those psychophysiologists who considered themselves well-informed of the literature believed that the modern poly-

---

**17.** Autonomic psychophysiologists specifically deal with autonomically controlled measurements of the human body, as discussed above.

graph technique was useful when considered with other evidence. The Court considers this figure to be significant, because acceptance or rejection of a technique by those who are well-informed about a particular technique is a significant indicator of the scientific validity/evidentiary reliability of the technique. On the other hand, acceptance or rejection of a technique by the uninformed or little informed is a poor indicator of the scientific validity of a given technique. Thus, for purposes of meaningfully accessing the scientific validity of the control question technique, this Court has considered the degree of acceptance amongst well-informed members of the relevant scientific community. The Court finds the high degree of acceptance within this group to be particularly indicative of reliability.

However, the Court notes that even within the relevant scientific community in general, the technique has achieved acceptance amongst a majority of the community. Far from having attracted only "minimal support" within the relevant scientific community, *see Daubert,* —— U.S. at ——, 113 S.Ct. at 2797, the modern polygraph technique enjoys substantial approval.

## (6) Whether The Polygraph Technique In This Case Was Properly Applied.

Although the *Daubert* Court did not specifically address whether the proper application of a known scientific technique is an issue bearing on the weight or admissibility of the evidence, this Court believes that the reliability inquiry set forth in *Daubert* mandates that in the context of polygraph examinations, where a party seeks to introduce expert testimony concerning the results of the test, the Court must embark upon a case specific inquiry to assure that the results are premised on a reliable application of the technique.

Both the Defendant's and the Government's expert witnesses testified that *when properly conducted,* the polygraph technique produces a high rate of accuracy. The qualification "when properly conducted" is of quintessential significance. It is clear from the studies and even proponents of the polygraph technique readily concede that the polygraph technique produces reliable results only where certain conditions exist, such as administration of the test by a well trained, experienced and competent examiner, the utilization of the control question technique and the utilization of a quantitative scoring system. The qualifications and experience of the examiner are of particular significance because the pretrial interview must be properly conducted and the questions must be properly framed in order to produce reliable results.

Various field and laboratory studies have validated the polygraph technique. They have indicated that the polygraph technique has the ability to determine truth or deception with a high degree of accuracy. However, the examiners in these studies were well-qualified and experienced, employed the control question technique and the numerical system of scoring. It is beyond dispute that if any of these conditions had been lacking, the studies would not have produced such high accuracy rates.[18] Thus, since the accuracy of the results in a particular case is so dependent on the existence of certain conditions at the time the test is administered, it is incumbent upon a court to scrutinize the particular application of the polygraph technique employed in each case.[19]

To permit expert testimony about polygraph test results where such essential conditions are lacking, is to permit the admissibility of unreliable, untrustworthy evidence. Thus, if a court determines that in a particular test the examiner was not well-qualified,

---

**18.** In fact, according to Dr. Raskin, this was precisely the reason why other studies were less methodologically sound and yielded significantly lower accuracy rates.

**19.** New Mexico Rule of Evidence 11–707 embodies the concern with the reliability of polygraph results where various conditions guaranteeing the trustworthiness of the results are not present. *See United States v. Gipson,* 24 M.J. 246, 253

(1987) (depending on the competence of the examiner, the suitability of the examinee, the nature of the particular testing process employed, and such other factors as may arise, the results of a particular examination may be as good as or better than a good deal of expert and lay evidence that is routinely and uncritically received in criminal trials).

and thereby failed to properly formulate the test questions, properly conduct the pretest interview or adequately interpret the results, the trustworthiness of the procedures employed and, therefore, the results of the test are seriously called into question. Under these circumstances, the underlying basis of the expert's testimony is simply not "supported by appropriate validation." *See Daubert*, —— U.S. at ——, 113 S.Ct. at 2795. The field or laboratory studies that validated the underlying hypothesis do not extend to validate the specific test in a particular case, unless the procedures utilized in the specific test replicate or substantially replicate those employed in the studies.

Having determined that *Daubert* mandates a case specific inquiry in the context of the application of the polygraph technique, the Court now addresses the application of the technique in this case.

In this case, Dr. Raskin conducted the polygraph examination. There is no question that Dr. Raskin is a well-trained, highly qualified and experienced polygraph examiner. His experience and training as a polygrapher is critical to the court's confidence in the accuracy of the results of this test.

The specific technique employed was the directed lie control question technique which is a refined version of the probable lie control question technique. This technique appears to be at least as accurate as the probable lie control question technique and tends to be more accurate with respect to diagnosing innocent subjects. The error rates for diagnosing guilty subjects, i.e. false-negative errors, is approximately 5% while the error rate for diagnosing innocent subjects, i.e., false-positive errors, is approximately 10%. In this case, if any error occurred it was a false-negative error. The Court's confidence in the accuracy of the result is raised because the Defendant has been diagnosed as truthful/innocent.

In addition, Dr. Raskin employed the numerical scoring method for evaluating the test results. As discussed more fully above, the numerical scoring system is the most widely used system for evaluating test results and is considered to have a high degree of reliability, principally because it has re-

moved much of the subjectiveness associated with the more primitive global scoring technique. Dr. Raskin arrived at a score of +29. In order to arrive at a truthful result the subject must score at least a +6 total. Thus, the total score of +29 represents a very clear result.

Dr. Raskin also utilized the computerized scoring method. This method ensures a completely objective analysis of the test results. In this case, the computer indicated that the probability of truthfulness was approximately .95, or 95 chances in a hundred, that these charts represented a result from a person who was being truthful. In light of the fact that both the numerical and computerized scoring systems were employed, the Court's confidence in the accuracy of the results is high.

Further raising this Court's confidence in the accuracy of the polygraph results in this case was the fact that a second highly qualified polygraph examiner, Dr. Hontz, independently reviewed and scored Defendant's polygraph charts and arrived at a score substantially similar to Dr. Raskin's. He calculated a score of +32. Furthermore, the polygraph exam was taped and a copy of the tape was provided to the Government. This enabled opposing counsel to independently review the quality of the examination and determine whether it was conducted properly.

The Government did not challenge any aspect of the examination other than asserting its position that the Defendant may have been engaging in countermeasures, thereby undermining the accuracy of the result. The Government's own expert, Dr. Barland, reviewed the polygraph charts and determined that the result was inconclusive based on his assessment that Defendant may have been engaging in countermeasures. Although the issue of countermeasures is a legitimate issue which deserves scrutiny, the Court does not consider the danger that a defendant may have engaged in countermeasures to be sufficiently great to invalidate the underlying theory of the polygraph technique or to invalidate the result in a particular case. This is so, because to successfully engage in countermeasures, an individual must receive highly

specialized hands-on training. Under these circumstances when the individual does engage in countermeasures, the examiner cannot even detect it. Spontaneous and or untrained attempts at engaging in countermeasures do not work. Given the very remote possibility that an individual has received the kind of specialized training necessary to successfully defeat a polygraph exam in this way, the Court views the issue of countermeasures as one going to the weight of the evidence rather than to its admissibility.[20]

**(7) Whether the Testimony will "Assist the Trier of Fact."**

In addressing *Daubert's* second prong, the relevance prong, the Court must ask whether Dr. Raskin's testimony will assist the trier of fact. That is, whether his testimony relates to an issue that is actually in dispute and whether such testimony provides a valid scientific connection to the pertinent inquiry. —— U.S. at ——–——, 113 S.Ct. at 2795–96.

A critical issue in this case is whether Defendant knowingly failed to report certain items of income on his income tax returns. Dr. Raskin's testimony that Defendant's answers to the relevant questions regarding his knowledge and intent are consistent with a truthful polygraph outcome, is pertinent to this issue. Thus, his testimony "relates to an issue that is actually in dispute." *Id.* Furthermore, in this case the testimony provides a "valid scientific connection to the pertinent inquiry."[21] *Id.*

In conclusion, having determined that Dr. Raskin's testimony is based on "scientific

knowledge" that "will assist the trier of fact" the Court finds that such testimony is sufficiently reliable and relevant to be admissible under Fed.R.Evid. 702.

**X. ADMISSIBILITY UNDER FED.R.EVID. 403**

■ The Court finds that Dr. Raskin's testimony is admissible under Fed.R.Evid. 403. The expert testimony is highly probative of a critical fact in issue, i.e., whether the Defendant possessed the willful mens rea at the time he failed to report certain items of income. This is so, because the accuracy of the test results is approximately 95%. In light of such an elevated accuracy rate, the results of the test are highly probative of whether Defendant did, in fact, realize that the items he failed to report should have been reported on his income tax returns.

On the other hand, the testimony in this case is not unduly prejudicial. There is little danger that the jury will consider the polygraph technique to be shrouded with "an aura of infallibility" given that Dr. Raskin himself will testify that the technique is not infallible. Moreover, any arguments that the jury will be unable to assess the true validity of the polygraph technique because of the "aura of infallibility" that surrounds the scientific testimony has no empirical basis. Dr. Raskin testified that studies and experience have indicated that juries are not overwhelmed by polygraph evidence and are, in fact, cautious and careful in assessing polygraph evidence.

Furthermore, the Government will be afforded an opportunity to cross-examine Dr. Raskin and present its own expert witness to

---

**20.** The Court views the issue of countermeasures as analogous to issues which arise in the context of other scientific techniques such as defeating a urine test by ingesting certain foods and the phenomenon of malingering on a psychiatric test. The mere possibility of malingering, for example, does not render the testimony concerning the defendant's mental condition inadmissible but rather is an issue for cross-examination and is an issue upon which competent experts in the field may disagree.

**21.** This Court examined the specific application of the polygraph technique under *Daubert's* reliability prong. However, scrutiny of the specific application of a known scientific technique is

also appropriate under *Daubert's* relevance prong. As the Tenth Circuit noted in *United States v. Davis*, 40 F.3d 1069 (10th Cir.1994), "improperly applied science cannot assist the trier of fact." *Id.* at 1075, n. 6. Although the *Davis* Court suggested that a trial judge's review of the proper application of a scientific technique is required only under *Daubert's* second prong, this Court believes that in the context of polygraph examinations, such inquiry impacts both prongs of *Daubert*. It is precisely because improper application of the polygraph technique produces substantially less *reliable* results that testimony regarding such results does not assist the trier of fact.

refute any of Dr. Raskin's testimony relating to the polygraph technique in general or to the specific application of that technique in this case. Thus, under the facts of this case, the Court concludes that the probative value of Dr. Raskin's testimony is not substantially outweighed by the danger of unfair prejudice.

## XI. CONCLUSION

For the aforementioned reasons, the Court finds that the expert opinion testimony regarding the polygraph results of Defendant Galbreth is admissible. However, because the evidentiary reliability of opinion testimony regarding the results of a particular polygraph test is dependent upon a properly conducted examination by a highly qualified, experienced, and skillful examiner, nothing in this opinion is intended to reflect the judgment that polygraph results are per se admissible. Rather, in the context of the polygraph technique, trial courts must engage upon a case specific inquiry to determine the admissibility of such testimony.

**WHEREFORE, IT IS ORDERED** that Defendant's Motion to Admit Expert Opinion Evidence Regarding Polygraph Results be and hereby is **GRANTED.**